UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRIS WHITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:08-cv-1735-TWP-TAB |
| ) | |
| KROGER LIMITED PARTNERSHIP II ) | |
| d/b/a INDIANAPOLIS BAKERY, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is before the Court on Defendant's Motion for Summary Judgment [Dkt. 58]. After a litany of alleged work-related transgressions, Plaintiff Chris White was fired from Defendant Indianapolis Bakery pursuant to its progressive discipline policy. Mr. White counters that his termination was unlawful because it was motivated by race. Mr. White also alleges intentional infliction of emotional distress. For the reasons set forth below, the court DENIES summary judgment on White's race discrimination claim and GRANTS summary judgment on his emotional distress claim.

### I.  BACKGROUND

**A.   Facts**

Defendant Indianapolis Bakery ("Defendant" or "Bakery") makes bread, rolls, buns, and flour tortillas for Kroger's supermarket and grocery stores. The Bakery employs roughly 230 employees. The majority of these employees are members of BCTGM Local 372-A ("Union"), and a collective bargaining agreement ("CBA") governs the terms their employment. The CBA expressly provides the right to grieve discipline or discharge.

Plaintiff Chris White ("Plaintiff" or "White") began working at the Bakery in March 2001 and was a member of the Union. He is African-American. For all times relevant to this dispute, White worked as a "vacation relief" employee – a veritable jack of all trades who fills in for vacationing co-workers. Given the nature of vacation relief work, White was required to know how to perform 14 different jobs in the Bakery's bread department.

During the course of White's employment, Union employees were subject to a progressive discipline policy ("Policy") that specifically applies to "Quality of Work" violations. Under the Policy, the number of violations is inextricably tied to the harshness of the punishment – the more violations, the stiffer the consequences. An employee is subject to termination upon incurring seven "Quality of Work" violations in any 12 month period. The tiers of discipline are as follows:

| **Occurrence in 12 Month Period** | **Discipline** |
|---|---|
| 1 | Counseling |
| 2 | Written Warning |
| 3 | Second Written Warning |
| 4 | Final Written Warning |
| 5 | 1 Day Suspension |
| 6 | 3 Day Suspension |
| 7 | Termination |

The Bakery tracked violations and levied punishment in accordance with the Policy.

Throughout 2007 and 2008, White had a rather turbulent relationship with his employer, culminating in his discharge in August 2008. Up to and including his discharge, the following disciplinary actions were taken:

- On July 5, 2007, White was disciplined for talking on his cell phone at work. White disputes that he was talking on his cell phone.

- On December 13, 2007, White received a written warning for running a product with an expired date code.

- On January 2, 2008, White received a second written warning for failing to clean his equipment.

- On January 26, 2008, White received a final written warning for failing to keep his work area clean. White disputes that his work area was dirty.

- On May 15, 2008, White received a one-day suspension for leaving his work area without permission during mandatory training on the operation of a bread moulder. As a result, White was disqualified from moulder bid. White disputes that this incident occurred, claiming he was on a duly authorized break.

- On June 13, 2008, White received a three-day suspension for failing to clean his equipment, pick up trash in his work area, and complete required paperwork. White disputes this, claiming that the work area was dirty only because no trash bins were available at the time and that the paperwork had been completed but had not yet been picked up.

- On July 19, 2008, White once again received a three-day suspension for incorrectly setting up his equipment and failing to clean his equipment and work area. White disputes this, claiming the moulder had to be adjusted due to the type and quality of the bread. This was White's sixth alleged violation in a twelve month period. Thus, if he committed another violation before December 13, 2008, he would be discharged.

- On August 6, 2008, White was suspended pending discharge after Kroger Manager Arnett Williams observed him not wearing his earplugs and chatting with a co-worker away from his designated work area. White disputes this, claiming he was in his work area taking baked bread out of pans at the time of the incident.

The last infraction constituted White's seventh in a twelve month period. The Bakery terminated White's employment effective August 6, 2008.

At the time of each of the above incidents, the Bakery created a "Constructive Advice Record" memorializing the nature of the offense. Specifically, the Constructive Advice Record

3

listed 15 categories of offenses that an employee might commit: (1) Customer Complaint, (2) Discourtesy, (3) Wasting Time, (4) Personal Untidiness, (5) Profanity, (6) Carelessness, (7) Disregard for Safety, (8) Quality of Work, (9) Tardiness, (10) Excessive or unauthorized absence, (11) Disregard of established rule well known to the employee, (12) Failure to follow instructions, (13) Improper check-out Procedures, (14) Quantity of Work, and (15) Other. All of the incidents involving White were classified as "Quality of Work" infractions.

Following White's termination, the Union grieved to arbitration, a hearing was held, sworn testimony was taken, and the arbitrator issued a final opinion. In the arbitrator's opinion, he noted Department Manager John Becraft's testimony that if an employee had a total of seven violations, but they were not all in the same category, the employee would not be subject to discharge. This was further corroborated by the testimony of Dana Widger, a human resources manager, and David Schneider, Union President. Taken to its logical conclusion, this means that an employee could amass a nearly endless litany of offenses without termination, if the offenses were spread among the various categories.[1] Needless to say, under this Policy, the *category* of offense is paramount. Based in part on this fact, the arbitrator ordered White's job reinstated, holding that his August 6, 2008 offense was better classified as a safety violation rather than a Quality of Work violation. However, the arbitrator refused to award White backpay, observing that White's conduct on August 6, 2008 indeed warranted discipline.

---

[1] By way of example, imagine an employee who, within twelve months, is issued 3 Wasting Time offenses, 5 Failure to follow instructions violations, and 6 infractions for going on profanity-laden tirades. This employee would *not* be discharged. Even more confounding, an employee who has committed seven violations of the same offense is treated more harshly than an employee who has committed 90 violations spread evenly among the 15 categories of offenses.

Pursuant to the arbitrator's decision, White returned to work on August 24, 2009. But his latest stint at the Bakery was short-lived. On March 10, 2010, White was sentenced to jail. Incapacitated, he was unable to work, and on March 18, 2010, White was terminated pursuant to the Bakery's attendance policy. White does not allege that the latest termination was unlawful. White does, however, allege that his August 6, 2008 termination was unlawfully motivated by race, thus causing him emotional distress.

**B.    Comparative Evidence**

The linchpin of White's race-based discrimination claim is that the Bakery, through the administration of its Policy, treated him less favorably than it treated similarly situated Caucasian employees ("comparator employees"). To bolster this claim, White points to four relevant pieces of comparative evidence.[2]

First, on November 14, 2007, Craig Harvey ("Harvey"), a Caucasian employee who works in the bread department, was disciplined for not wearing a beard cover. His offense was categorized as a "Disregard of established rule well known to the employee." By contrast, on August 6, 2008, White was disciplined for a similar offense – not wearing his ear plugs and chatting with a fellow employee away from his work area – yet his offense was categorized as a "Quality of Work" violation.

Second, on December 10, 2009, Craig Lathrop ("Lathrop"), a Caucasian employee who works in the bun department, was disciplined for using his cell phone on the production floor.

---

[2] It is worth noting that in his deposition, White devoted considerable attention to allegations that Doreen Mowery, Robin Kirk, Wendy Durham, and Tonisha Roberts were similarly situated employees who were treated more favorably. Curiously, none of these names are found in White's opposition brief.

His offense was categorized a "Violation of Plant Policies and or Procedures." By contrast, on July 5, 2007, when White was disciplined for talking on his cell phone on the production floor, his offense was categorized as a "Quality of Work" violation and "Disregard of established rule well known to the employee."

Third, on December 9, 2009, Laura Gillenwater ("Gillenwater"), a Caucasian employee who works in the bread department, was disciplined for applying the wrong code to a product. Her offense was categorized as a "Violation of Policies and Procedures." By contrast, on December 13, 2007, when White was disciplined for running a product with an expired date code, his offense was categorized as a "Quality of Work" violation.

Fourth, White claims that Bryan Hopkins ("Hopkins"), a Caucasian employee who works in the bread department and is assigned to vacation relief, applied an expired code to a bakery product, causing a truckload of goods to be sent out with expired dates. According to White, Mr. Hopkins was not disciplined for his mistake. Because no discipline was imposed, nothing in the evidentiary record supports White's claim, save for his own affidavit. On December 13, 2007, when White was disciplined for running a product with an expired date code, his offense was categorized as a "Quality of Work" violation. According to White, these instances reinforce his theory that the Bakery was trying to terminate him by wedging all of his alleged violations into the category of "Quality of Work."

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

6

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubts as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

As discussed, White has stated two causes of action against the Bakery: (1) wrongful termination because of race in violation of Title VII and (2) infliction of emotional distress.[3] Each claim is discussed separately below.

---

[3] White's EEOC Charge and original Complaint brought a claim for retaliation. However, White's Amended Complaint does not include such a claim. In his opposition brief, White concedes that he is not pursuing a retaliation claim. [Dkt. 65 at 1].

**A.     White's Title VII Claim**

Under Title VII, it is well-established that a plaintiff may prove race discrimination in one of two ways: either (1) through direct evidence, or (2) indirectly through the burden shifting mechanism of *McDonnell Douglas*. *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (citations omitted). White concedes that he does not have direct evidence of race discrimination, and therefore relies on the *McDonnell Douglas* paradigm. Under this framework, a plaintiff must first establish a *prima facie* case of discrimination based on race. *Id*. (citation omitted). Once that is established, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the action. *Id*. (citation omitted). If defendant meets that burden, then the burden shifts back to plaintiff to establish that the reasons proffered by the defendant were mere pretext. *Id*. (citation omitted). Each component of the *McDonnell Douglas* framework is analyzed separately below.

   *1. Prima Facie Case*

To establish a *prima facie* case of race discrimination, White must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) (citations omitted). "To defeat summary judgment on the *prima facie* case, [plaintiff] need only demonstrate that there is a genuine issue of material fact regarding these factors." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999).

No one disputes that White, an African-American person, is in a protected class and suffered an adverse employment action when he was terminated. The Bakery does, however,

8

dispute that White was meeting its legitimate expectations and that non-African-American similarly situated employees were treated differently.

### a. Similarly Situated Employees

"Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). "To make this showing, a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces." *Id*. Nevertheless, similarly situated employees must be directly comparable in "all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citation omitted). Relevant factors for making this determination include "whether the employees dealt with the same supervisor and were subject to the same standards." *Id*. (citations and internal quotations omitted). To prove this element, White must demonstrate that the comparators occupied the same job level and engaged in similar misconduct but were nonetheless subject to more favorable disciplinary action. *See, e.g., Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005); *See also Filar*, 526 F.3d at 1061 ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.").

As discussed above, in his opposition brief, White pointed to four pieces of comparative evidence. The Bakery counters that the comparative evidence is entirely distinguishable from White's circumstances, rendering it irrelevant: "The disciplinary records for [the comparator employees] not only fail to satisfy the obligation to be 'directly comparable' in 'material' ways, but they also fail to stand up comparably in temporal contrast." [Dkt. 74 at 2].

First, addressing two pieces of White's comparative evidence, the Bakery highlights that

the disciplinary records for Gillenwater and Lathrop were issued in December 2009, long after White's termination and after the arbitrator issued his decision notifying the Bakery that it had misclassified White's last disciplinary record. These temporal distinctions, according to the Bakery, render these disciplinary records irrelevant. Second, the Bakery implies that Harvey's disciplinary record – for failing to wear a beard cover – is different than White's disciplinary record for failing to wear earplugs (which the arbitrator ruled should have been classified as a safety violation), because there is no evidence suggesting that failing to wear a beard cover is a safety violation. Finally, with respect to Hopkins, the Bakery notes that White's contention that Hopkins was not disciplined for incorrectly coding a truckload of bread is merely *one* example of different treatment, which is not enough to support an inference of discrimination.[4] *See Shank v. Kelly-Springfield Tire Co.*, 128 F.3d 474, 480 (7th Cir. 1997) ("one example of better treatment is not enough to support an inference of discrimination.") (citation omitted). The Bakery also highlights that White cannot point to any comparative evidence involving an employee who reached the seventh step of discipline under the Policy, but who was not terminated.

---

[4] Hopkins' alleged offense, for which he was not disciplined, is similar in nature to White's December 13, 2007 offense, for which he received a written warning. The Bakery notes that it is well-settled in the Seventh Circuit that such reprimands, by themselves, do not constitute "adverse employment action[s]." *See, e.g., Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001). Specifically, the Seventh Circuit has stated that a materially adverse employment action is "one that significantly alters the terms and conditions of the employee's job," and must involve more than inconvenience or alteration of job responsibilities. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (citations omitted). Here, however, the circumstances are unique, given the inflexible nature of the Policy. Thus, *but for* the Bakery's arguably inconsistent application of its Policy, White would not have been suspended and discharged at the times that he was. Unquestionably, suspensions and termination constitute adverse employment actions. Moreover, with respect to the Hopkins allegation, even if the Court were to jettison this instance from its calculus, the other allegations could still suffice in establishing that similarly situated employees were treated differently.

The Court is not persuaded. On this point, the Bakery's arguments are important for what they do not say. The Bakery does not address the job level of the comparator employees and whether the employees were subject to the same standards. Here, as White notes, the employees at issue had similar jobs and the CBA and discipline forms indicate that the employees were subject to the same standards. What is more, the Court disagrees that the employees are not directly comparable and that temporal distinctions render the comparative evidence irrelevant. Viewing the record and drawing all reasonable inferences in favor of White, the Court finds that the employees' positions were comparable, their acts were sufficiently similar in nature, and the discipline they received was not so remote in time that it should be considered wholly irrelevant. As such, the Court finds that White satisfied the similarly situated element for his prima facie case by establishing that the Bakery, through the administration of its Policy, treated some Caucasian employees differently. *See, e.g., Stalter*, 195 F.3d at 289 (plaintiff met similarly situated prong of *prima facie* case by showing that employer counseled a Caucasian employee who committed a similar offense instead of terminating her).

b. **Legitimate Job Expectations**

Additionally, as an element of White's *prima facie* case, he is required to show that his performance on the job was adequate." *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) (citation omitted). The plaintiff cannot satisfy this requirement by merely showing that his performance was adequate for some period of time during his employment. *Id*. Rather, the "critical issue is whether [he] was performing well in [his] job *at the time of [his] termination*." *Id*. (emphasis added).

The Bakery claims that White failed to meet its legitimate expectations, constantly

pushing the edges of the progressive discipline policy. Indeed, from June 12, 2003 to May 11, 2007, White amassed nine Constructive Advice Records, and from July 5, 2007 to August 6, 2008, he amassed eight more. According to the Bakery, White's persistent disciplinary problems belie his claim that he was meeting expectations: "If any employee begins to experience a repetitive pattern of violation of . . . work rules, appropriate discipline will follow, up to and including termination." [Dkt. 59 at 12].

In his opposition brief, White gives this argument relatively short shrift. His rebuttal argument is largely confined to the statement, "White has designated evidence that he was meeting the defendant's performance expectations, as many of the disciplinary complaint against White were false." [Dkt. 65 at 6]. White did offer an affidavit disputing or explaining away six of the incidents for which he was disciplined. In this sense, White has proffered evidence that he did not do what he was accused of doing (i.e. that the Bakery's accusations are false). Under these circumstances, this evidence could suffice to establish adequate performance. After all, if it could not suffice, White would be ensnared in an untenable position. It would be impossible for an employee to unearth evidence that he was performing adequately if his employer was manufacturing infractions against him to paint just the opposite picture.

Finally, it is worth noting that by setting forth the terms of and implementing its unique Policy, the Bakery effectively codified its own subjective expectations for its employees. As part of these expectations, an employee would not be fired until he committed seven Quality of Work offenses. Logically following, prior to his seventh infraction within a twelve month period, White could be deemed to be performing adequately (i.e. good enough to retain his job), even if his performance was less than flawless. In its opening brief, the Bakery notes, "Any

employer has the legitimate expectation that all employees will adhere to well-publicized . . . work rules." [Dkt. 59 at 12]. But the countervailing fact must be true, too: any employee has the legitimate expectation that his employer will apply its well-publicized rules uniformly. Viewing the record and drawing all reasonable inferences in favor of White, the Court finds that White was meeting the legitimate expectations of the Bakery.

### 2. *Legitimate Non-Discriminatory Explanation & Pretext*

The Bakery has offered a legitimate non-discriminatory reason for White's termination: That is, White committed a specific number of violations within a set time period, thus warranting termination pursuant to the progressive discipline policy. In accord with the *McDonnell Douglas* paradigm, the burden now shifts to White to show that the Bakery's explanation is pretextual. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and internal quotations omitted). For pretext determinations, the Court's only concern "is the honesty of the employer's explanation." *Id.* at 984 (citation and internal quotations omitted). Thus, the Court must analyze whether or not the Bakery's proffered explanation is a lie to cover up unlawful retaliation.

According to White's affidavit, he did not commit violations that he was accused of committing. If true, this would be forceful evidence casting doubt on the genuineness of the Bakery's explanation. In making its determination, the Court is also mindful of the Bakery's arguably variable application of its Policy. After all, an employer's departure from its own policies and procedures may create a genuine issue of material fact as to pretext. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (citation omitted). Given the

13

Bakery's arguably inconsistent application of its policy and White's affidavit, coupled with drawing all reasonable inferences in favor of White, the Court finds that genuine issues of material fact exist as to pretext. For the reasons set out above, summary judgment is not warranted on White's Title VII race discrimination claim.

B.      **Intentional Infliction of Emotional Distress**

White's Amended Complaint also includes a claim for intentional infliction of emotional distress.[5] To establish liability for this cause of action, a plaintiff must prove that a defendant (1) engaged in extreme and outrageous conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress. *Munsell v. Hambright*, 776 N.E.2d 1272, 1280 (Ind. Ct. App. 2002) (citations omitted). The touchstone of this tort is "the intent to harm one emotionally." *Id.* (citation omitted). White alleges that a discharge grounded in race is well-suited for such a claim. [Dkt. 65 at 10]. The Court is not persuaded for two reasons.

First, White proffered no meaningful evidence to bolster his claim that he suffered severe emotional distress. At his deposition, White testified that, in the prior week, he had visited Dr. James O'Bryan at the Putnamville Correctional Facility. White met with Dr. O'Bryan for roughly five to seven minutes. White was neither diagnosed with a mental illness nor prescribed medication. What is more, White has not met with any other health care providers in relation to

---

[5]White's Amended Complaint includes claims for both intentional and negligent infliction of emotional distress. However, in his opposition brief, White indicates that his claim is limited to intentional infliction of emotional distress. [Dkt. 65 at 10]. Based on this response, the Court deems waived his claim for negligent infliction of emotional distress. *See, e.g., Gaskin v. Sharp Electronics Corp.*, No. 2:05-CV-303, 2007 WL 2819660, at *4 (N.D. Ind. Sept. 26, 2007) (citing *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003), which held that arguments not presented to the court in response to a summary judgment motion are waived).

his claim of emotional distress. White counters that there are innumerable reasons why a person may not see a doctor, including financial concerns. That excuse, albeit true, does not abrogate the need to proffer evidence of emotional distress in order to survive summary judgment.

Second, more generally, even if White showed emotional distress, the Court still questions the appropriateness of this claim. No evidence suggests that the Bakery discharged White in order to inflict emotional pain. *See Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) ("Here, Joganic's claim of intentional infliction of emotional distress fails as a matter of law because Powdertech's act of firing him pursuant to its disciplinary policy does not constitute extreme and outrageous conduct."). As the Bakery observes, White can identify no other source for the Bakery's alleged intentional infliction of emotional distress towards him other than his termination. For these reasons, White's claim fails, and summary judgment is warranted.

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [Dkt. 58] is DENIED with respect to Plaintiff's Title VII race discrimination claim and GRANTED with respect to Plaintiff's emotional distress claims.

SO ORDERED:

Date: 10/12/2010

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Casey Jo Eckert**
BINGHAM MCHALE LLP
ceckert@binghammchale.com,mgroce@binghammchale.com

**Joseph H. Hogsett**
BINGHAM MCHALE, LLP
jhogsett@binghammchale.com,mgroce@binghammchale.com

**Adam Lenkowsky**
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com,ecf.alenkowsky@gmail.com

**Kenneth T. Roberts**
ROBERTS & BISHOP
ktrobatty@aol.com

**Tasha Rebecca Roberts**
ROBERTS AND BISHOP
troberts@roberts-bishop.com